Mary OLYMPIC, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Civ. No. A82–396.

United States District Court, D. Alaska.

Aug. 8, 1985.

Donald Cooper, Alaska Legal Services, Anchorage, Alaska, for plaintiff.

Bruce Landon, Asst. U.S. Atty., Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

FITZGERALD, Chief Judge.

Plaintiff Mary Olympic appeals from a decision of the Interior Board of Land Appeals (IBLA) rejecting her request that the agency reinstate her father's Native allotment application and permit her to amend the land description therein. Olympic and defendant United States filed cross motions for summary judgment. For the reasons set forth below, I grant Olympic's motion for summary judgment and reverse the IBLA's decision.

*Background*

Alexis Gregory, Olympic's father, filed a Native allotment application in 1960 for land which he and his family had used since at least as early as 1922.[1] The application was filed pursuant to the Alaska Native Allotment Act of 1906, 34 Stat. 197, as amended (repealed 1971). An official of the Bureau of Indian Affairs (BIA) of the Department of the Interior (DOI) assisted Gregory in plotting the location of his allotment on a map attached to his application. Gregory also submitted an Evidence of Occupancy form listing a log cabin and two log caches as improvements on the land.

The Bureau of Land Management (BLM) of the DOI conducted a field examination of Gregory's allotment by airplane in 1961. Although the examiners found no improvements on the land described on the application, they located improvements "approximately one mile northeast" but noted the improvements "do not appear to be of the size and number as claimed by the applicant." After speaking with two witnesses who substantiated Gregory's use of land in the vicinity of the area plotted on the application map, the examiners concluded that Gregory "has undoubtedly complied with the regulations as to use of the land in the area" and recommended that Gregory "be requested to submit a better description that will include his improvements and not exceed 5 acres so that the improvements can be located and positively identified."

BLM examiners conducted a second field examination in 1963 and again were unable to locate the claimed improvements. They concluded:

It appears that the applicant should be requested to submit a description for the land on which his improvements are actually located. However, if the present description actually describes the land desired by the applicant, the evidence of occupancy should be rejected as the applicant has not actually occupied and appropriated the land to his own use.

Because BLM examiners were unable to locate Gregory's improvements on the land described in the application, the BLM sent Gregory a letter in 1964 requesting that he submit a corrected land description. Gregory signed a receipt indicating he received the letter, but he did not attempt to file a corrected land description. In 1967, the BLM twice requested that the BIA contact Gregory and assist him in filing a new description, but the BIA was not successful in contacting Gregory. Gregory died on September 7, 1967. Without knowledge of Gregory's death, the BLM rejected Gregory's application in a decision dated October 13, 1967. The decision, sent to Gregory, was returned to the BLM marked "Deceased." Neither the BLM nor the BIA made any attempts to contact Gregory's heirs regarding the allotment application.

In May 1975, Mary Olympic, Alexis Gregory's daughter, requested that the BLM reopen Gregory's case so that she could

---

1. Olympic's *Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment,* filed May 18, 1984, contains a thorough recitation of the facts in this case with citations to numerous supporting documents. Only a brief summary of the facts will be repeated here.

correct the land description. The BLM denied the request. Olympic renewed her request in 1976. The BLM again denied it. Olympic appealed to the IBLA, which upheld the BLM's denial in 1980, and again, on reconsideration, in 1982. *See Mary Olympic,* 47 IBLA 58 (1980); *Mary Olympic (On Reconsideration),* 65 IBLA 26 (1982).

The IBLA held that because Gregory's allotment application had been finally rejected by the BLM in 1967, there was no application "pending" on December 18, 1971, the effective date of the Alaska Native Claims Settlement Act (ANCSA). 47 IBLA at 62–63; 65 IBLA at 32–33. When Congress enacted ANCSA, it repealed the Alaska Native Allotment Act, but included a savings clause for any application "pending before the Department of the Interior on December 18, 1971." ANCSA § 18(a), 43 U.S.C. § 1617(a) (1982). According to the IBLA, had Olympic requested, before December 18, 1971, that the BLM reopen Gregory's application, the BLM might have been permitted to do so. The IBLA held, however, that "[b]y failing to act before the passage of ANCSA, [Olympic] allowed any right to reopen the application to lapse." 47 IBLA at 62.

The IBLA additionally ruled that even if Olympic's claim were not barred by the repeal of the Native Allotment Act, Olympic had no right to amend her father's application. 47 IBLA at 63–64; 65 IBLA at 30–32. According to the IBLA, there is no vested right to an allotment until use and occupancy of a given parcel coincide with an allotment application for the same parcel. Because Gregory had not perfected his right to an allotment at the time of his death, there was no inheritable property right which survived his death to be passed on to Olympic.

Olympic then filed this action in district court seeking declaratory and injunctive relief. Olympic filed a motion for partial summary judgment to require the BLM to reinstate and adjudicate Gregory's allotment application. The government filed a cross motion for summary judgment to declare Gregory's original allotment application legislatively approved but to disallow any amendment to the original land description.

*Discussion*

Resolution of this case turns on the proper interpretation of § 905 of the Alaska National Interest Lands Conservation Act (ANILCA), 43 U.S.C. § 1634 (1982). ANILCA was enacted on December 2, 1980, almost eight months after the IBLA issued its original decision in *Mary Olympic,* 47 IBLA 58 (April 14, 1980). After that decision was issued, both parties petitioned for reconsideration. The IBLA granted the petitions in part "to consider ... the provisions of the Alaska National Interest Lands Conservation Act (ANILCA), Act of December 2, 1980, 94 Stat. 2371, as they relate to this appeal." *Mary Olympic (On Reconsideration),* 65 IBLA 26, 27 (1982). However, the IBLA made only a single brief reference to ANILCA in its decision. *See id.* at 32. I now find that ANILCA § 905 is of central importance to this case, and I address it at some length.

First, subsection (a) of ANILCA § 905 provides for legislative approval of certain Native allotments. That statute states in relevant part:

(a) Approval of applications for certain lands ...

(1) Subject to valid existing rights, all Alaska Native allotment applications made pursuant to the Act of May 17, 1906 (34 Stat. 197, as amended) [the Native Allotment Act] which were pending before the Department of the Interior on or before December 18, 1971, and which describe ... land that was unreserved on December 13, 1968 ... are hereby approved on the one hundred and eightieth day following December 2, 1980, except where provided otherwise by ... this subsection....

■ The IBLA did not mention § 905(a) or the issue of legislative approval at all in its opinion on reconsideration. However, the government now concedes that § 905(a) provides for legislative approval of Gregory's allotment as described in Gregory's

original application, and that Gregory's heirs are entitled to the land therein described. I hold that § 905(a) applies here to legislatively approve Gregory's allotment application.

The government, nevertheless, contends that Olympic has no right to amend the land description to entitle her to land other than that described by Gregory in his original application. Resolution of this dispute hinges on the correct interpretation of subsection (c) of § 905.

Section 905(c) provides in relevant part:
(c) Amendment of land description in application ...

An allotment applicant may amend the land description contained in his or her application if said description designates land other than that which the applicant intended to claim at the time of application and if the description as amended describes the land originally intended to be claimed.

In its decision on reconsideration in this case, the IBLA stated that the right to amend is limited to the applicant and is thus inapplicable where the applicant has died prior to the attempted amendment. *Mary Olympic (On Reconsideration)*, 65 IBLA 26, 32 (1982). The government urges affirmance of the IBLA, arguing that the right to amend an allotment application to correct an erroneous land description is a personal right of the applicant alone. Olympic, on the other hand, claims that § 905(c) permits the heirs of a deceased applicant to amend an allotment application which incorrectly describes the land sought by the applicant. This is the dispute at the heart of this case.

In a case, such as this one, involving statutory interpretation, I must start with the language of the statute itself. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). In general, a court must show deference to the interpretation of a statute by an agency charged with its administration. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *United States v.*

*Louisiana-Pacific Corp.*, 754 F.2d 1445, 1447 (9th Cir.1985). The principle of deference is not, however, without exceptions, and the court remains the final authority on important questions of statutory construction. *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *Livermore v. Heckler*, 743 F.2d 1396, 1404 (9th Cir.1984); *Patagonia Corp. v. Board of Governors of the Federal Reserve System*, 517 F.2d 803, 812 (9th Cir.1975). "[The court] must reject administrative constructions of a statute that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Louisiana-Pacific*, 754 F.2d at 1447; *see also Bob Jones University v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983). Interpretations of a statute which lead to absurdity of result should be avoided. *Pacific Mutual Life Insurance Co. v. American Guaranty Life Insurance Co.*, 722 F.2d 1498, 1500 (9th Cir.1984).

By its express language, ANILCA § 905(c) permits "an allotment applicant" to amend a land description. The statute does not explicitly extend this right to heirs of an applicant. The IBLA held that the right to amend is a personal right of the applicant alone.

According to the arguments advanced by the government, Mary Olympic is entitled to the parcel of land identified on the map submitted with Gregory's original allotment application even though this may not be the parcel used, occupied, and improved by Gregory and his family. Likewise, in other cases where an allotment applicant died without correcting an erroneous land description, the heirs would receive land, but not the land used and improved by their forebears.

■ Olympic contends that the government's interpretation of § 905(c) leads to an unreasonable result inconsistent with congressional purpose in enacting this provision. I agree. The legislative approval provision in § 905(a) automatically ap-

proves pending allotment applications. To convey to an applicant's heirs a parcel of land, but not the land which the applicant used and improved and for which the applicant intended to apply, is an absurd result.

The legislative history of ANILCA § 905 further supports Olympic's argument. The Senate Report on ANILCA states in part:

*Alaska Native Allotments*

Section 905 approves specified applications for allotments under the 1906 Alaska Native Allotment Act and provides further authority for the amendment and adjustment of such applications. The Committee's intent is to promote allotment finality by Section 905 and thereby to promote conveyance finality under the Alaska Native Claims Settlement Act.

... Under current departmental regulations, all timely allotment applications must be field-examined and adjudicated on a parcel-by-parcel basis, a process which has proved to be time-consuming and expensive.

Until shortly before the passage of the Alaska Native Claims Settlement Act, rural Alaska Natives were generally unaware of the availability of allotments. A longstanding failure to implement the 1906 Act, cultural and language barriers, and the isolation of most Alaska villages resulted in a low application rate until the late 1960's. In 1970, an allotment assistance program jointly implemented by the Rural Alaska Community Action Program and the Bureau of Indian Affairs, began to reach Natives residing in remote villages.

The resultant increase in the application rate left over 7,400 allotment claims to be adjudicated following the passage of the Alaska Native Claims Settlement Act. Most applicants had long been qualified for allotments, but had neither the means nor the technical knowledge necessary to initiate the process earlier. The complexities of allotment adjudication, as well as uncertainty introduced by litigation, have slowed the allotment process and pose a risk that multiple re-adjudications of certain applications will be necessary.

The pendency of large numbers of allotment applications will impede timely conveyance of lands to Native village corporations, notwithstanding other statutory measures to expedite such conveyances....

... The statutory approval implemented by Section 905 is intended to summarily approve allotments in all cases where no countervailing interest requires full adjudication. It is anticipated that final conveyance of land to village corporations will thereby be expedited and that the village reconveyance plans required by Section 14(c) of the Alaska Native Claims Settlement Act will be made less burdensome and confusing.

S.Rep. No. 413, 96th Cong., 2d Sess. 237–38, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5070, 5181–82. As to subdivision (c) of § 905, the Report continues:

A significant percentage of Alaska Native allotment applications do not correctly describe the land for which the applicant intended to apply. Technical errors in land description, made either by the applicant or by the Department in computing a metes-and-bounds or survey description from diagrams, are subject to correction under authority of Section 905(c). In accordance with the Department's existing procedures for the amendment of applications, subsection (c) requires that the amended application describe the land the applicant originally intended to apply for and does not provide authority for the selection of other land. The allotment application, as amended, is subject to statutory approval or adjudication under the terms of Section 905 on the basis of the corrected land description.

*Id.* at 286, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 5230.

■ I find that Congress' intent in enacting § 905 was to facilitate approval of the backlog of Native allotment applications by dispensing with the usual time-consuming adjudication procedures. Congress recog-

nized the extent of the erroneous-land-description problem when it noted that "[a] significant percentage" of applications misdescribed the land sought. The Senate Report provides that "[t]echnical errors in land descriptions ... are subject to correction ... [i]n accordance with the Department's existing procedures for the amendment of applications." *Id.* The legislative history indicates no congressional intent to limit the right to amend only to applicants themselves.

In the past, the BLM has permitted heirs of Native allotment applicants to file amended applications to correct erroneous land descriptions. *See* Exhibit 47 to Plaintiff's Motion for Partial Summary Judgment (filed May 18, 1984). Congress intended in § 905(c) that corrections in land descriptions be allowed "[i]n accordance with the Department's existing procedures for the amendment of applications." I find that the "Department's existing procedures" included a policy of allowing heirs to amend land descriptions.

■ My conclusion is further supported by the general principle that statutes passed for the benefit of Indians (including Alaska Natives) are to be liberally construed, and doubtful expressions should be resolved in the Indians' favor. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979); *Pence v. Kleppe,* 529 F.2d 135, 140 (9th Cir.1976) (court cites this principle in case involving Alaska Native Allotment Act); *Aguilar v. United States,* 474 F.Supp. 840, 846 (D.Alaska 1979) (protection of Native property rights under Alaska Native Allotment Act is an element of the federal government's trustee relationship toward Alaska Natives). The Alaska Native Allotment Act was passed to enable Alaska Natives to protect the lands which they used and occupied from encroachment by non-Natives. *See* H.R.Rep. No. 3295, 59th Cong., 1st Sess. (1906), *quoted in Pence,* 529 F.2d at 141. ANILCA was enacted to "promote allotment finality" and to address problems caused by Natives' lack of awareness and technical knowledge of the allot-

ment process. Because both provisions were enacted for the Natives' benefit, they must be liberally construed in the Natives' favor. Allowing the heirs of applicants to amend the land description fulfills this requirement.

The government claims that reference to an allotment "applicant" in § 905(c) as contrasted to reference to allotment "applications" elsewhere in § 905 compels a contrary result. I am not persuaded. Both words appear throughout § 905, often in close proximity to each other, *see, e.g.,* § 905(a)(5)(C), and I do not find the distinction determinative here.

■ The government further argues that because the test for determining the permissibility of an amendment is based on an applicant's intent, Congress meant to limit the right to amend to applicants themselves who could competently provide evidence of their own intent. Heirs of deceased applicants, according to this argument, would frequently be unable to furnish adequate evidence of intent. I recognize, as does Olympic in her supporting papers, that an heir may face a difficult or impossible task in proving the intent of the original applicant. However, this does not warrant prohibiting all amendments by all heirs. The Department of the Interior must afford each heir an opportunity to prove the applicant's intent.

For all these reasons, I conclude that the IBLA's interpretation of ANILCA § 905(c) is unreasonable and leads to an unreasonable result. I find that to fulfill the congressional purposes inherent in the Alaska Native Allotment Act and ANILCA, heirs of deceased applicants should be permitted to amend applications to correct erroneous land descriptions. I accordingly reverse the decision of the IBLA.

I therefore GRANT Olympic's motion for partial summary judgment and DENY the government's cross-motion for summary judgment. The Department of the Interior shall allow Olympic to amend the land description in Gregory's application to describe the land Gregory originally intended to claim. The Department shall approve or

adjudicate Gregory's application, as amended, pursuant to ANILCA § 905(a) and 905(c).

This case is REMANDED to the Department of the Interior for proceedings consistent with this decision.

ORDERED ACCORDINGLY.